Davis, Judge,
delivered the opinion of the court:
This is an action brought to test the legality of plaintiff’s release in July 1961 from active duty in the Air Force. At that time he was a reserve officer serving on extended active duty, holding the rank of captain. He had a generally good record, both parties agree, during his three years of World War II service and his ten years following his voluntary recall from the Reserves in 1951. The disputed service began after his assignment to the Fifth Air Force in Japan which led ultimately to his release from active duty.
Captain Reale, trained as an air observer (bombardier) and as an intelligence officer, was assigned to the 6000th Support Wing as a “surplus” intelligence officer in December *588 1959. In. April 1960, be was given job first one and then another Officer’s Open Mess at or near Fuchu Air Station, Japan. His performance in this slot resulted in a very derogatory officer’s effectiveness report (usually abbreviated as OEE) written on July 19, 1960, by his superior. Plaintiff filed a lengthy rebuttal to this report, purporting to refute each specific charge and generally laying the blame for his difficulties at the feet of his commanding-officer, the author of the uncomplimentary survey. After an investigation, the OEE was indorsed, as written, by the Deputy Commander for Administration and finally by the Wing Commander (on September Y, 1960), thereby becoming a part of Eeale’s permanent file. An appeal to the Officer Personnel Eecords Eeview Board to have the report removed was denied on December 20,1960.
In the meantime the derogatory was cause significant adverse actions against plaintiff. By letter of September 12, 1960, he was informed that “you have been placed on the Control Eoster” pursuant to Air Force Eegu-lation (AFE) 86-40,[1] under the provisions of which “Your reporting official has placed you under special observation for 120 days upon completion of which a special effectiveness report will be rendered”. Pie was specifically warned that—
2. It is expected that you will avail yourself of this opportunity to demonstrate that your performance can be raised to the standard expected of an Air Force officer. Continued substandard performance will make you subject to consideration for action that could result in release from active duty or elimination.
3. You will be advised of the results of this period of observation.[2]
By this time, Captain Eeale had been assigned to the 6000th Supply Squadron, under a new reporting officer. His performance during the trial period at the new post was satisfactory, and on January 24, 1961, this reporting officer submitted a Special Officer’s Effectiveness Eeport which was complimentary. The new report was reviewed and indorsed by the same Deputy Commander and Wing Commander (the *589 latter on February 6th.), and on February 13th Fifth Air Force Headquarters advised that plaintiff had been removed from the Control Roster. But this happy ending gave plaintiff little cause for rejoicing, for two weeks earlier he had learned that he was nevertheless to be released from active duty, regardless of the outcome of the 120-day trial-period.
Unknown to Reale, sometime in October 1960 — after the warning letter of September 12th supra — the Commander of the Pacific Air Forces had recommended him for release from active duty or demotion under AFR 36-35.[3] The specific reason for this action does not appear; however, there is nowhere suggested any additional cause other than the derogatory effectiveness report which led to the special 120-day observation period under AFR 36-40.[4] Also without plaintiff’s knowledge or notice to him, a board of officers had convened on December 1, 1960, at Headquarters USAF, to consider recommendations under AFR 36-35 regarding officers possessing the permanent reserve grade of captain, and had selected plaintiff for release from active duty as of July 31,1961. This December board did not, of course, have before it the post-trial-period favorable OER later issued on J anuary 24,1961.
Captain Reale’s first notice of this adverse board action was a letter two months later (January 31, 1961), sent through his Wing Commander, notifying him of the board’s determination. A month later, on March -8th (well after the notification that he 'had been removed from the Control Roster because of the satisfactory report in January 1961) he was informed that his release had previously been approved by the Secretary of the Air Force on January 3rd (again, two months before the notice). Plaintiff sought redress under Article 138 of the Uniform Code of Military Justice from the Inspector 'General of the Fifth Air Force; *590 the appeal was rejected on September 8,1961. He was released from active duty, as earlier advised, on July 31,1961. Subsequently be bas twice applied, unsuccessfully, to the Air Force Board for the Correction of Military Records for removal of the derogatory OER and revocation of the orders releasing him from active duty.[5]
Plaintiff urges that AFR 36-35 must AFR 36-40, that so combined they do not allow for the institution of the AFR 36-35 proceedings before the end of the AFR 36-40 special observation period, and therefore that his release from active duty was in violation of the applicable regulations.[6] We agree. In measuring the personnel actions of both the military and civilian branches against the commands of their regulations we often find it necessary to look to more than one provision or one regulation. See, e.g., Piccone v. United States, 186 Ct. Cl. 752, 407 F. 2d 866 (1969); Faircloth v. United States, 186 Ct. Cl. 133 (1968); Biddle v. United States, supra note 5, 186 Ct. Cl. at 105-107 (concurring opinion); Glidden v. United States, 185 Ct. Cl. 515 (1968); Keef v. United States, 185 Ct. Cl. 454 (1968) (refusing to limit one regulation by the existence of another) ; Seebach v. United States, 182 Ct. Cl. 342 (1968); Middleton v. United States, 170 Ct. Cl. 36, 40 n. 6 (1965) ; Rowe v. United States, supra note 6, 167 Ct. Cl. at 468 (rationalizing AFR 39-17 and AFR 35-4). Indeed, it is usually essential that our interpretation take into account the interrelationship and interaction of the various available *591 procedures — looking toward a unified and rational personnel management system and not a fragmented bodge-podge of unique, isolated, and contradictory rules. See, e.g., Piccone v. United States, supra; Seebach v. United States, supra, 182 Ct. Cl. at 350-52. In Piccone, we recently field that, in the light of the peculiar burdens placed on a civilian Navy employee in prosecuting a disability retirement claim while at the same time defending an agency disability-discharge action, the Navy’s Civilian Personnel Instructions should be construed to bar the institution of the discharge action until the disability retirement proceeding was finally resolved by the Civil Service Commission. A similar result is required in this case.
In September 1960, Captain Reale was notified of the beginning of a special trial-period on the Control Roster under APR 36-40; he was in effect told that his performance had 'been unsatisfactory and that he was to be given a chance to prove himself anew, with grave sanctions possible if he did not show improvement, including “release from active duty or elimination”. He entered upon this course, applying himself diligently to prove his worth to the Air Force during the 120 days he was given; he succeeded in lifting his performance measurably and obtained the approbation of his superiors. But without any notice to him, the Air Force, at the same time, started the secret AFR '36-35 procedure and released him outright, for precisely the same reason for which he had originally been put on the Control Roster.
The service’s actions border on gross misrepresentation to Captain Reale, for the letter putting him on the Roster certainly implied that the sanction of release from active duty would not 'be imposed during the trial period. The institution of another, secret proceeding looking to that very end was contrary to the honest expectation of any man in Reale’s position. One actively entering into a proffered trial period hardly anticipates that meanwhile he can be fired without regard to the results of the trial, at least for the same cause for which he was being put to the test; that is especially true when the warning letter tells him explicitly that he “will be advised of the results of this period of observation” and that *592 “continued substandard performance you to consideration for action that could result in release from active duty * * *”. Captain Beale could properly feel aggrieved at being unceremoniously yanked from active duty for substandard performance without any regard being paid to his service during the specified four-months proving period. We will not lightly assume that the Air Force intended such an unfair result to flow from its regulations.
While the comparative scope and regulations is not completely clear, the gist of AFB 36-40 and AFB 36-35 point to their consecutive and not contemporaneous use. AFB 36-40, entitled “Officers Control Procedure”, specifies that appropriate commanders will establish “Control Bosters”, on which officers “whose performance is substandard or marginal” will be maintained. While on the Control Boster an officer may not be reassigned to another command. Paragraph 2 delineates the instances in which an officer’s name will be put on the Control Boster, including failure to be selected for promotion to certain grades, receipt of a derogatory officer’s effectiveness report, failure at a school attended at government expense, or when “his conduct or current performance of duty warrants such action”. Commanders are to review records of their officers periodically, and, if due cause appears, to place him on the Boster “and/or” institute other “punitive or administrative action”. When an officer is put on the Boster, he can be informed of a special 120-day observation period, after which a special OEB will be issued. There is provision for a second 120-day period, and for commencement of other action on the basis of either the first or second special report. In addition, there are several instances in which commanders are authorized to place officers on the Control Boster for identification only, not subject to special observation.[7]
AFB 36-35 concerns “Belease From Active Duty motion of Officers”, and supplies a means for either removing or demoting an officer “who does not. clearly demonstrate an ability and a willingness to accept and discharge the responsibilities and duties associated with his grade and rank.” Begu-lar Air Force officers are demoted under AFB 36-35; reserve *593 officers serving in a grade equal to or lower than their permanent reserve grade (this was Captain Eeale’s position) cannot be demoted and must therefore be released from active duty. The reasons warranting action under AFE 36-35 are stated very generally, but relate primarily to inefficiency or incompetence.[8] Major air commanders or the Deputy Chief of Staff, Personnel, actually initiate the action, but recommendations may be forwarded by any commander. The Chief of Staff periodically appoints boards of officers to consider recommendations, and officers “nominated” before these boards convene are carried on the command Control Eoster. The regulation does not specifically provide for any notice to the officer “nominated”, but does require that a copy of his latest OEE be forwarded to the board, which can recommend demotion, release, or retention on active duty at current rank. This recommendation then goes to the Secretary of the Air Force, whose decision is final.
There is also a third regulation which is pertinent — AFE 36-2, “Elimination or Eelease from Active Duty By Eeason of Unfitness, Unacceptable Conduct, or Inefficiency”.[9] We do not reach plaintiff’s contention that his release could only have been under AFE 36-2, but we do find that regulation relevant to the correct interpretation of AFE 36-40 and AFE 36-35. AFE 36-2 provides for action against nonprobation-ary reserve officers on active duty (Eeale’s situation), either releasing them from such duty or eliminating them from the Air Force altogether (including the reserve position).[10] If the primary ground for action is inefficiency, AFE 36-2 instructs that AFE 36-35 be used; fifteen other grounds for action under its provisions are specified (¶ 5a) (under many of *594 which Neale’s reported conduct would fit). For the lesser ten of these reasons, a recommendation for release from active duty is appropriate provided the officer has not had “extensive service” (¶ 5b, c) (completed or approaching ten years’ active duty, ¶ 4b). Otherwise, apparently, elimination must be recommended and action taken on that basis (although release from active duty may become the ultimate sanction, ¶ 23a, b). An officer recommended for elimination from the Air Force under AFN 36-2 is entitled to notice of the charges against him, a hearing before a specially-convened Board of Inquiry, the right to counsel, and an opportunity to present and cross-examine witnesses. (¶¶ 12-18) Officers recommended only for release from active duty are given a copy of the recommendation by the recommending officer and accorded the opportunity to present in writing, as an indorsement to the recommendation, any material considered important to a decision. (¶¶ 11a (2), 12) In addition, a Board of Inquiry may be granted at the discretion of Air Force Headquarters. (fí4b)
As already noted, there is no specific provision for notice and answer under AFN 36-35,[11] and no such rights were granted Neale. If notice and opportunity to answer are not available under AFN 36-35 — and if that directive applies while the officer is going through his 120-day observation period under AFN 36-40 — then the regulations, taken all together, anomalously provide that an officer with less than ten years’ service may be released from active duty pursuant to AFN 36-2, under which he has at least the right to notice and reply, but an officer with longer service can get similar rights only if he is recommended for total elimination from the service under AFN 36-2; he can be recommended for release from active duty only under AFN 36-35 which gives him no opportunity to present his case to the board of officers.[12]
*595 This curious confusion of regulations, and especially the absence under AFE 36-35 of any express right to notice and answer, cause us to scrutinize even more closely, and to try to harmonize, the relationship of AFE 36-35 to AFT?, 36-40, since the special observation period and effectiveness reports under AFE 36-40 provide some notice of unsatisfactory performance and impending additional adverse action. Thus, basic considerations of fairness and the elementary rights of notice and opportunity to answer charges endangering a man’s career 'both push toward a requirement that, once a special observation period has been initiated under AFE 36-40, other adverse action arising from the same charge should await the outcome of that trial period.
The provisions of AFE 36-35 and AFE 36-40, although not absolutely free from doubt, point to the same result. First, AFE 36-40 seems throughout to contemplate the commander’s opting either for observation periods or for more drastic action. Paragraph 3a requires that the records of all assigned officers be “reviewed periodically to determine whether any officer’s performance or conduct warrants elimination, demotion, ,or special observation” (emphasis added). Paragraph 4c (2) provides that, if the report of the first observation period “indicates that the officer’s performance is still substandard but does not warrant demotion or elimination”, the officer may be placed under a second period of observation. And, finally, paragraph 4d states:
When the first or second report indicates that the officer should be demoted, released from active duty in lieu of demotion (Eeserve officers only), or eliminated, the commander will initiate action under appropriate regulations. Officers identified for demotion or release from active duty consideration will be retained on the Control Eoster without requirement for additional observation, until final action has been accomplished under the provisions of AFE 36-35 (emphasis added).
This final section shows that the “proper time” for action under AFE 36-35 is after the completion of the latest observation period, that the “appropriate regulation” for release can be 36-35, that such action comes after the first or second report based on the 120-day period, and that, once such action has been initiated, the officer “will be retained on the Control *596 Roster without requirement for additional observation!' (emphasis added).
The only provision of AFR 36-40 which leaves room for a contrary interpretation is paragraph 4a (1) authorizing a commander, upon discovering any of the reasons for Control Roster action, to “Initiate punitive or administrative action, mid/or" place his name on the Control Roster and start the special observation period (emphasis added). The “and/or” could possibly be interpreted to authorize both the 120-day observation period and the summary, secret AFR 36-35 action simultaneously. However, we find it at least equally permissible, and more just, to read the provision as allowing the simultaneous taking of proper administrative steps (i.e., other than a proceeding under AFR 3,6-35), which could include many administrative actions aside from release, demotion or elimination proceedings;[13] it could also authorize institution of AFR 36-35 proceedings while placing the officer on the Control Roster for identification purposes only, as indicated in paragraph 4d supra.
This same understanding of the proper order of procedure under AFR 36-40 and AFR 36-35 appears in the latter regulation. Paragraph fia states:
Major air commanders submit the names of officers * * * to Headquarters USAF. Dates for submitting names are announced approximately 90 days before the boards convene. When officers are identified for consideration under this regulation before the announced dates for nominations, their names will be carried on the command Control Roster (see AFR 36-40) and recommendations forwarded at the proper time.
Defendant would read “proper time” to refer to “dates for submitting names” in the same paragraph. We find it more reasonable to consider it as referring back, in appropriate cases, to the relevant procedures under AFR 36-40, mentioned but five words before. “Proper time” in that sense would be after a first or second special OER had shown that the officer should be recommended for demotion or release from active duty. Additional support for this view is found in sub-paragraph 6a (2) which requires a copy of the latest OER to *597 be contained in the recommendation for AFR 36-35 action; if the latest OER is more than ten months old, a new one is to be made. It would indeed be inconsistent for the Air Force to insist on the most up-to-date information on the officer’s performance and to overlook entirely the results of a special observation study currently underway with regard to his usefulness to the service.[14]
For these reasons we hold that AFR '36-40 and AFR 36-35, read together, require the Air Force to await the outcome of the special 120-day observation period and the special OER under 36-40 before instituting 36-35 action on the basis of the same initial derogatory effectiveness report.[15] 'Plaintiff’s transfer to the Control Roster was for the express purpose of an observation period, not merely for identification preliminary to institution of the AFR 36-35 proceedings. The regulations were therefore violated and his release from active duty was void.
He is entitled to recover back pay, less appropriate offsets, and judgment is entered to that effect. The specific amount of his entitlement will be determined pursuant to Rule 47 (c) ,[16]
FINDINGS OE EACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff was born in 1921. In June 1943, he was accepted as an aviation cadet in the United States Air Force after satisfying the eligibility requirements for such an appointment.
*598 2. On or about April 14, 1946, plaintiff was honorably released from active duty with the rank of Second Lieutenant and at the same time 'accepted into the inactive reserve of the United States Air Force.
3. On March 21, 1951, plaintiff applied for recall to extended active duty in the Air Force. On June 28,1951, he was voluntarily recalled to active duty as a Second Lieutenant and assigned to Randolph Air Force Base, Texas.
4. Plaintiff attended bombardier refresher training at Connolly Air Force Base, Texas, from August 7,1951 to September 11,1951, and successfully completed this training.
5. Plaintiff entered B-29 combat crew (bombardier) training at Randolph Air Force Base, Texas, on September 18, 1951, and successfully completed this training on February 16,1952.
6. Plaintiff was temporarily promoted to the grade of First Lieutenant on August 26, 1952, and subsequently this promotion was made permanent.
7. Plaintiff attended basic observer (navigation-bombardier) training at Ellington Air Force Base, Texas, from March 26,1952 to 'September 5, 1952. A Faculty Board, convened on August 28, 1952, recommended that plaintiff be eliminated from the training course by reason of academic deficiency. On September 26, 1952, plaintiff met a Flying Evaluation Board which recommended that he be suspended from flying status. A Flying Evaluation Board, reconvened on November 3, 1952, recommended plaintiff’s retention on flying status because the Board found that the training course which plaintiff had failed was not considered directly related to his previous aeronautical rating. On review of the November 3, 1952 proceedings, Headquarters Air Training Command directed that they be vacated 'and that a new Flying Evaluation Board be convened; however, since in the meantime plaintiff had been reassigned and transferred, said Command forwarded the case to Headquarters, USAF, recommending that plaintiff be retained on flying status, which recommendation was approved.
8. Plaintiff attended bombardier refresher training at Sheppard Air Force Base, Texas, from January 9, 1953 to February 19, 1953, and successfully completed this course.
*599 9. Plaintiff attended bombardier gunnery training at Lowry Air Force Base, Colorado, from February 23,1953 to on or about March 21, 1953, and successfully completed this course.
10. Plaintiff received B-29 combat crew training at Kan-dolph Air Force Base, Texas, from on or 'about March 16, 1953 to May 10, 1953, and successfully completed this course.
11. On May 13, 1953, plaintiff was transferred to Hunter Air Force Base, Georgia, where he performed duty as an aircraft observer (bombardier) on flying status, in accordance with his assigned primary specialty, until 'September 4, 1954. At that he was assigned additional duty as squadron intelligence officer for the 314111 Bomb Squadron, apparently consistent with a secondary assigned specialty; however, it appears that he continued to retain his primary assigned specialty of bombardier on flying status.
12. While still assigned to duty as a squadron intelligence officer at Hunter Air Force Base, plaintiff attended the Officers Intelligence School at Lowry Air Force Base, Colorado, from which school he graduated in June 1954.
13. On November 22 and 23, 1954, plaintiff was tried by a special courts-martial for making a false official statement on June 1, 1954, while at Lowry Air Force Base. He was acquitted of this charge.
14. Between March 15, 1955 and July 23, 1956, plaintiff attended and successfully completed training at Mather Air Force Base, California, in Primary Basic Observer Upgrading and Advanced Observer Tactical Bombardment and Beconnaissanee.
15. On March 12,1956, while receiving training at Mather Air Force Base, plaintiff was given a temporary promotion to the grade of Captain which promotion subsequently was made permanent.
16. Plaintiff was on official leave from July 23, 1956 to September 9,1956. On the latter date he reported to an Air Force station (unidentified and since deactivated) in Brooklyn, New York, for transportation to Spangdahlem Air Base, Germany, to which base he was assigned, effective September 18, 1956, as an aircraft observer (photo-reconnais- *600 sanee navigator) with tbe First Tactical Reconnaissance Squadron.
17. In about tbe middle of December 1956, plaintiff was removed from bis duty assignment as an aircraft observer aboard an RB-57 reconnaissance aircraft and assigned as the Club Custodian, i.e., officer or manager, of tbe 10th Tactical Reconnaissance Wing Officers Club at Spangdahlem Air Base, a position for which be had bad no training or previous experience. He was given only a few days’ notice of this assignment during which time be made an effort to prepare himself for bis duties by reading a manual relating to the operation of clubs and messes. However, tbe officer whom plaintiff replaced as Club Manager was made bis assistant and they functioned together. Plaintiff’s new duty assignment was effected by orders which changed his primary specialty to Administrative Officer and designated flying as his secondary specialty. Plaintiff continued to perform the duties of Club Officer until December 13, 1957, at which time he was assigned duty as an intelligence officer.
18. Plaintiff was made Club Officer because of the Wing Commander’s desire that such action be taken. The Wing Commander supervised the 10th Air Base Group Commander, Col. Byron W. Brown, Jr., who directed the operations of the Club through the Materiel Officer, Major William E. Bruce, plaintiff’s immediate supervisor in the chain of command.
19. Plaintiff presented uncorroborated testimony, lacking in details and specificity, to the effect that contrary to applicable regulations he was requested to extend preferential treatment to the Air Base Commander and members of the latter’s staff, to the extent of giving them foodstuffs from the Club; that he refused to grant requests of this kind in the absence of specific approval of the Wing Commander to whom such requests were referred; and that this action on plaintiff’s part caused a “little” friction between him on the one hand and the Air Base Commander and his staff on the other.
20. Plaintiff received a regularly scheduled Air Force Officer Effectiveness Report dated August 21,1957, and certified by Major Bruce as the Reporting Official. The report was generally favorable and the rating official’s “Overall *601 Evaluation” of plaintiff was as follows: “a dependable and typically effective officer.” However, tbe following excerpts from tbe report are somewhat derogatory in nature and indicate some of the reasons why plaintiff encountered difficulties.
IV. COMMENTS OF REPORTING OFFICIAL
$ ‡ ‡ $
b. Strengths.
* * * [Plaintiff] is a aggressive and headstrong person. * * *
c. Weaknesses.
* * * [Plaintiff] does not try to solve problems with the resources available to him. Difficult problems that require appreciable work and coordination are permitted to exist without a effort to reach the most successful solution. * * * [Plaintiff] has occasional difficulties in working in close harmony with his associates. * * * [Plaintiff] is the type of person who likes to have free rein in the operation of the club and he does not readily accept guidance and instructions that are contrary to his desires.
The reporting official recommended that plaintiff be assigned to instructor or aircrew observer duty.
21. The above report was reviewed by the Air Base Commander who made an endorsement thereon, dated September 17, 1957, indicating that he did not agree with the reporting official’s evaluation of plaintiff, which endorsement was qualified as derogatory in nature. Plaintiff exercised the opportunity afforded him to file a written “Rebuttal” to this endorsement. Upon review, the Wing Commander made an “Additional Indorsement,” dated Januaiy 3, 1958, to said report, sustaining plaintiff’s rebuttal and endorsing him.
22. (a) By orders dated November 21, 1957, plaintiff (as well as 29 other officers) was formally suspended from flying status, effective January 1,1958, under the provisions of Paragraph 29i, Chapter 2, Air Force Manual (AFM) 35-13, dated June 3,1957, which reads in pertinent part:
i. When the Chief of Staff, TJSAF, Considers Suspension Necessary. The Chief or Staff, USAF2 may suspend a rated officer from flying status without flying evaluation board action when such a suspension is in the best inter *602 est of the Air Force and there no keeping the officer on flying status. This type of suspension wül be without prejudice to the individual.
(b) The order mentioned in (a), above, stated in part as follows:
* * * Reason for SUSP [suspension]: No valid RQR [requirement] for officer’s retention on flying status.
(c) According to testimony presented by plaintiff, he was one of “a little over 1,100 officers throughout the Air Force” who was “grounded” effective January 1,1958.
(d) On the basis of the record as a cannot be found (as proposed by plaintiff) that (1) “[r]ecent flying experience was an important consideration in determining which officers would be removed [suspended]”; that
(2) “[o]fficers in flying status on directed should not have been removed from flying status”; or that
(3) “[p]laintiff would probably not have been flying status pursuant to Air Force Manual 35-13 [mentioned in (a) above] had he not been taken off flying duty and made an Officers Club Custodian.”
23. In March 1958, plaintiff was States and assigned as an intelligence officer with Headquarters, 4th Fighter Day Wing, Seymour Johnson Air Force Base, North Carolina, effective June 1, 1958. At that time, his primary ground specialty was designated as that of an intelligence officer. Although plaintiff’s official Military Record, AF Form 11, reflects he was carried as an intelligence officer, first with the above-mentioned unit from June 1,1958 until July 1,1958, and then with Headquarters, 4th Tactical Fighter Wing, at the same base from the latter date through August 18, 1959, plaintiff presented credible testimony supported by corroborating documentary evidence that he was a “surplus” intelligence officer and that he was made, and actually served as, Plans and Training Officer for one or the other of the aforesaid Wings during the period from June 1, 1958 until August 19, 1959, when he was reassigned to duty as Headquarters Squadron Section Commander at said base. At the time plaintiff was first assigned to this duty, he objected in some unspecified manner to this assignment. While defendant contends, contrary to the record, *603 actually as an intelligence officer during the aforestated period of time in question, it is undisputed that as of August 18, 1959, plaintiff was then serving in a “surplus” capacity.
24. Under date of August 18,1959, plaintiff, while at Seymour Johnson AFB, directed a written communication to the Commander, Headquarters Squadron, 4th Tactical Fighter Wing, in which plaintiff volunteered, pursuant to permissive Air Force Eegulations (AFN), i.e., the provisions of para. 4b, Part one, chapter two, AFM 85-11, as amended, for duty in Europe, and requested that he be assigned to duty in Germany if he should be selected for assignment on the Continent.
25. It appears that subsequent to volunteering for duty in Europe, plaintiff, while home on leave, mentioned to friends his interest in being assigned to Germany and expressed dissatisfaction over the fact that he had not received assignment to that country. Thereafter, some unidentified individual apparently communicated plaintiff’s feelings in regard to this matter to a Congressional source with the result that the Air Force received a verbal inquiry from Congress concerning plaintiff’s assignment. While plaintiff admittedly became aware of the fact that a certain individual had contacted one or more Congressmen in regard to plaintiff’s assignment, there is no evidence that such action was specifically solicited by him or that he made a direct, personal contact, either oral or written, with any member of Congress concerning this subject matter.
26. By orders dated December 3,1959, plaintiff was transferred to Headquarters, Fifth Air Force, Japan, as an intelligence officer, with directions to report for duty in January 1960.
27. (a) Plaintiff received a regularly scheduled Officer Effectiveness Beport, dated December 17,1959, covering the period from December 4, 1958 to December 13, 1959. While this report was not considered derogatory in nature, it did state, under the heading “Recommended Improvement Area,” as follows:
In my opinion, Captain Neale exhibited a degree of immaturity when first assigned as Headquarters Squad *604 ron this assignment and the dissatisfaction he expressed oyer not receiving the overseas area of his choice. Although he volunteered for overseas duty, he appeared to be greatly upset because he failed to get the overseas area he desired. His expression of dissatisfaction was allowed to get outside of Air Force channels and resulted in a verbal query from Congress to the Air Force concerning his assignment. Captain Reale erred in that he failed to follow normal channels and did not take his problem up with the Commander concerned. I have discussed this problem with Captain Reale at length. I believe he now realizes the importance of following proper command channels and will do so in the future. I also believe that Captain Reale’s outlook on assignments has improved, that he realizes now that he will not always get the assignment of his choice and that he will strive to do a good job regardless of the assignment he receives. [Emphasis supplied.]
(b) Plaintiff presented credible testimony to the effect that an examination of his master personnel file at Westover Air Force Base, Massachusetts, on May 19,1966, failed to disclose anything therein indicating Congressional contact or intervention with respect to plaintiff’s assignment, other than the reference made thereto by the officer who submitted the Officer Effectiveness Report partially quoted in (a) above. The record does not disclose the basis for that part of the rating official’s statement which relates to a verbal inquiry having been received by the Air Force from Congress concerning plaintiff’s assignment.
28. Upon was assigned to the Estimates and Studies Division, Deputy Chief of Staff, Fifth Air Force, as a surplus intelligence officer, on February 3, 1960. Plaintiff was then assigned to Fuchu Air Station, Japan, as an intelligence officer, effective February 5, 1960. He served at that place in said capacity until he was reassigned to the Washington Heights Officers Open Mess, as Club Officer (manager), effective April 18, 1960. Plaintiff had not requested the latter assignment. He had no formal training for said position; however, as previously indicated, plaintiff had about 1 year’s experience as a Club Officer in Germany and had performed the duties of such position in a manner rated as satisfactory. His immedi- *605 alte superior as Club Manager was Lt. Col. Lyle F. Johnston who was the Secretary/Custodian of the Club, and his Wing Commander was Col. Lewis B. Meng.
29. On May 3, 1960, plaintiff was advised that he was transferred to Fuchu Air Station Officers Open Mess, under the same superior officers as those at the Washington Heights Officers Open Mess and in the same capacity as he had served there. On the same date, plaintiff sent to his Commanding Officer a letter (erroneously dated April 3, 1960) in which plaintiff requested that he be retained as Club Officer at the Washington Heights Officers Open Mess or, in the alternative, that he be returned to his former organization. This request was denied and plaintiff’s transfer to the Fuchu Officers Mess confirmed by his Wing Commander in a letter dated May 19,1960.
30. Plaintiff served as Club Officer of Fuchu Air Station Officers Open Mess through July 7, 1960, on which date he was relieved of this duty, and on July 8,1960, he was assigned to the 6000th Supply Squadron under a new immediate supervisor.
31. Plaintiff’s duty assignments as Club Officer of the Washington Heights Officers Open Mess and the Fuchu Air Station Officers Open Mess, during the period from April 18,1960 to July 8, 1960, a total of 80 assignment days, were performed under the immediate supervision of Lt. Col. Johnston (mentioned in finding 28). The latter signed and issued in the capacity of reporting officer, an Officer Effectiveness Keport (AF Form 77) dated July 19,1960. While this report purported to cover the period from December 14, 1959 to July 7,1960, it is undisputed that it was obviously based upon the services performed by plaintiff as Club Officer of the above-mentioned Messes during said 80-day period of time. This report discloses the reasons underlying plaintiff’s transfer from the Washington Heights Officers Open Mess to the Fuchu Air Station Officers Open Mess and his release from duty at the latter place.
The report rated plaintiff as very low in cooperation, judgment, management qualities and promotion potential, and indicated additional inadequacies in sense of duty, reliability, and loyalty; the over-all evaluation was the lowest possible— *606 unsatisfacory. The Reporting Officer specified a number of purported incidents to substantiate the general evaluation, including: plaintiff’s antagonizing of the women’s clubs, closing the bar abruptly, refusal to take advice, unexplained absence from his office at the Fuchu club, delay in moving his quarters upon request, unauthorized renovations (one involving the panelling of his own office), employment of a dependent, accusation that a senior officer was promoting a system of procurement of Japanese beef for personal gain, and general evasion and distortion of facts in conversation with his superior, the Reporting Officer.
32. (a) At that time, plaintiff was not due for a regularly scheduled, mandatory annual Officer Effectiveness Report pursuant to the provisions of paragraph 11a, AFR 86-10, dated June 10, 1958, as changed by AFR 36-10A, dated June 18, 1959, entitled, “Officer Personnel Effectiveness and Training Reports,” infra. Item, 1(10) of the July 19, 1960 report reflects that the “Reason for Report” was “Dir [Directed] by Wing Commander.” AFR 36-10 (as changed), supra, which was in effect at all times material here, reads in pertinent part:
SECTION B — AF FORM 77, “USAF OFFICER EFFECTIVENESS report”
* * * * *■
11. When to Submit AF 11. Submit * * * [it] as enumerated below; * * * do not use effectiveness reports as a means of, or basis for, disciplinary action. The appropriate “Reason for Report,” for entry as item 1(10), is indicated in each subparagraph below.
a. Mandatory Submission. Submit AF 11 immediately provided the period of supervision is 120 or more days in (1) through (4), below, or * * *.
(1) When the reporting official changes. “Ohange of reft off.” This occurs when the officer is assigned to a new immediate supervisor for a period expected to extend at least 60 days for reasons which include:
(a) Reassignment of either the officer or his reporting official.
(b) Departure of either the officer or his reporting official on TDY or for attachment to a training organization.
*607 (4) When an officer’s status is changed to missing, missing in action, captured, or interned, or when he is dismissed, retired, confined by sentence or court-martial, or separated. * * *
*****
(8) For deferred officers who are serving in a “once deferred” status: When such an officer completes a special observation period in accordance with AFB 36-40, and at the completion of each 120-day period of supervision thereafter, until he is selected for either promotion or elimination from the service. (See paragraph 4a(2) (a), AFB, 36-40A, 22 January 1959.) “Officer in deferred status.”
*****
b. Directed Submission. Submit AF 77:
* * * * *
(2) When wing commanders, their equivalents or commanders at higher echelons direct the submission of reports, provided the periods of supervision are at least 120 days, under the following conditions. uDir by (wing, * * *) commander.”
*****
(b) To obtain a report when an officer’s name is placed on a control roster under AFB 36-40.
(c) To record the special observation periods required under AFB 36-40; also see a (8) above.
(3) When wing commanders, their equivalents, or commanders at higher echelons direct the submission of reports, provided the periods of supervision are at least 60 days but less than 120 days, under the following conditions:
(a) When the reporting official changes as in a(l) above. uOhange of rept off. Dir by (wing, * * *) commander.”
(b) When an officer’s status is changed as in a (4) above. “Officer (missing, missing in action, captured, interned, dismissed, retired, confined, or separated, as appropriate'). Dir by (wing, * * *) commander.”
x X X * *
NOTE: (3) is intended to cover unusual situations, not all of which can be anticipated by more specific provisions. The final decision to direct such reports, therefore, rests with the appropriate commander, without a limitation on the types of situations in which he may consider.submission of a report to be in the best interest of the Air Force. A problem may occur when a period of *608 supervision of less visor thereby loses the opportunity to reflect important or unusual performance of duty in a report, except by providing information to the next reporting official. There have also been situations in which an officer could complete a tour of duty, or even terminate an entire period of extended active duty, without completing 120 days under a reporting official’s supervision. In such a case it would usually be better to have a 60- to 119-day report than none at all. Such a report would not necessarily record unusual performance. * * *
(b) On the basis of the foregoing, it is found that the July 19, 1960 Officers Effectiveness Report as to plaintiff was submitted by the reporting officer at the direction of plaintiff’s wing commander who acted under the provisions of paragraphs 11. b. “Directed Submission” (3) (a), (b), and NOTE to (3) (all quoted in pertinent part in finding 32(a), supra).
33. By letter dated July 19, 1960, plaintiff was furnished the original copy of the July 19, 1960 “Officers Effectiveness Report” (finding 31); advised that the “Performance Factors, Overall Evaluation and Comments of the Reporting Official make the Effectiveness Report derogatory in nature”; and requested to indorse said letter with comments concerning the report direct to Col. Walter J. Wilson, Deputy Commander for Administration, 6000th Support Wing, the designated Indorsing Official for the report to whom copies thereof had been sent.
34. Under date of August 3, 1960, plaintiff sent to Col. Wilson a lengthy, detailed rebuttal letter directed to the July 19,1960 Officers Effectiveness Report. In this and later documents, he objected to the low ratings, arguing that he was given the tough job of straightening out the affairs of clubs which had been loosely run before, that he encountered understandable opposition, but that he got no support for his efforts from his superior, the Reporting Officer. In answer to the specific incidents alleged he stated: that his refusal to authorize the use of club funds for bridge club matters and club facilities for non-members was proper and that his position had been misrepresented by the women involved; that the bar was closed on the Reporting *609 Officer’s instructions; that Ms absences were required by the nature of Ms work or otherwise justified, and that he worked a great deal of overtime; that he failed to move because he was not ordered to do so; that one of the renovations was within his budgetary authority, the other the result of his subordinate’s unauthorized action, for which he took responsibility out of loyalty to his staff; that the dependent hired was higMy qualified and the terms of the employment fair; and that the purported accusation of an officer was only a chance gossipy remark made without malice to the officer’s wife. He also made cross-accusations of incompetence, lack of trustworthiness and truthfulness, and unwarranted harassment (by Mring an informer among the kitchen staff and requiring unjustified audits) on the part of the Reporting Officer. Thereafter, during the period between August 15 through August 22,1960, an informal administrative investigation in regard to the circumstances concerning said effectiveness report was conducted by Lt. Col. Clifford A. Johnston. Conflicting statements by plaintiff and Lt. Col. Lyle F. Johnston on matters set forth in the effectiveness report provided ¡the basis for the investigation. In a 6-page report dated August 24,1960, covering the investigation, submitted to Col. Wilson, the investigatmg officer set forth numerous “observations,” “conclusions,” and “Recommendations.” In brief, the investigating officer concluded that the comments of the reporting official in the effectiveness report were accurate, except in certain specified respects, and recommended that “the effectiveness report be submitted as written,” but “that the indorsing official take into consideration the information” contained in the investigation report relating to the statements which were determined not to be true.
35. On August 30,1960, and September 7, 1960, the Deputy Commander for Administration and the Wing Commander, respectively, concurred in the evaluation of plaintiff as set forth in the Officers Effectiveness Report of July 19, 1960. Plaintiff neither received, nor was given the opportunity to receive, a hearing on the effectiveness report and rebuttal; however, no hearing was required under the applicable regulations.
*610 36. Pursuant to tbe provisions of APE 31-11, dated October 6, 1059, plaintiff submitted an application in tbe nature of an appeal to the Officer Personnel Eecords Eeview Board, requesting that bis personnel records 'be reviewed and tbe July 19, 1960 effectiveness report be removed or changed. Plaintiff’s records were reviewed and his request was denied on December 20, 1960, without a hearing. The above regulation does not provide for a hearing.
37. Plaintiff was placed on the Officer Control Poster, and he was advised that this had been done in a letter dated September 12,1960, which reads:
1. Under the provisions of paragraph 2e, AFE 36-40, 17 July 1958, you have been placed on the Control Poster maintained at this headquarters. Your reporting official has placed you under special observation for 120 days upon completion of which a special effectiveness report will be rendered. You will be considered ineligible for reassignment during this period. This action is based on the Derogatory Effectiveness Eeport rendered on you for the period 14 December 1959 to 7 July 1960.
2. It is expected that you will avail yourself of this opportunity to demonstrate that your performance can be raised to the standard expected of an Air Force officer. Continuded [sic] substandard performance will make you subject to consideration for action that could result in release from active duty or elimination.
3. You will be advised of the results of this period of observation.
38. Sometime in October 1960, the Commander, Pacific Air Forces, recommended that plaintiff be considered for demotion pursuant to AFE 36-35, dated April 8,1960. (See findings 40(a), 42, 43 and 49.) An inspection by plaintiff of his Master Personnel File, prior to the trial herein, failed to disclose facts concerning the procedures which led to the Commander’s above-mentioned recommendation. It is reasonable to assume that action was initiated as a result of the July 19, 1960 Officer Effectiveness Eeport issued as to plaintiff.
39. Plaintiff presented credible testimony to the effect that sometime in January 1961, subsequent to the end of the 120 days’ probationary period, his immediate superior officer showed him a Special Officers Effectiveness Eeport as to plaintiff which was ready for submission; that this report *611 was based upon plaintiff’s performance while be was on tbe Control Roster; that plaintiff’s superior discussed the report with him and invited any comments he might have;- that since the report was very favorable, he did not offer any comment; and that he gained the impression the report would be submitted shortly in the form drafted. Thereafter, on January 24, 1961, a Special Officers Effectiveness Report covering the period from July 8, 1960 to January 21, 1961, complimentary in nature, was executed by plaintiff’s immediate superior as the reporting official.
40. (a) Under date of January 31,1961, prior to the time the January 24, 1961 Special Officers Effectiveness Report was reviewed and indorsed by either the Deputy Commander or the Wing Commander (see finding 41), plaintiff acknowledged receipt of a letter dated January 31, 1961, sent by Headquarters, 6000th Support Wing, to plaintiff’s superior for delivery to plaintiff. This letter stated in pertinent part:
2. A selection 'board of officers to consider officers possessing permanent reserve grade of Captain for demotion and/or release from active duty was convened at Headquarters USAF1 December 1960. Captain Dante S. Reale, A0203202T was selected for release from 'active duty.
3. Request officer be advised of his status not later than 31 January 1961. Officer will be released from active duty on 31 July 1961 unless he is eligible for retirement or retention for retirement in accordance with paragraph 9, AFR 36-12. * * *
(b) The above letter was the first notice given to plaintiff that action had been initiated to terminate his active duty career. Accordingly, it is apparent that he was not afforded an opportunity to protest his proposed release, or to request deferment of action on his case until after the Special Officers Effectiveness Report resulting from Ms Control Roster duty was issued.
41. The Special Officers Effectiveness Report executed on January 24, 1961 (finding 39), was reviewed and indorsed by the Deputy Commander, as the Indorsing Official, on an unidentified date which undoubtedly was sometime early in 1961. Thereafter, on February 6, 1961, the report was approved and indorsed by the Wing Commander. As a result *612 of this report, Headquarters, Fifth Air Force, advised on February 13,1961, that plaintiff “has been removed from the Control Noster maintained by this headquarters”; that he “may now be considered for reassignment when a requirement occurs”; and that plaintiff should be informed of this action and requested to acknowledge receipt of such notification.
42. By letter dated March 8, 1961, the Department of the Air Force, By Order of The Secretary of The Air Force, advised plaintiff, in pertinent part :
1. A board of senior officers recently convened at Headquarters USAF under AFR 36-35, “Release from Active Duty and Demotion of Officers”. The Board recommended that you be released from extended active duty. The report of the board was approved by the Secretary of the Air Force on 3 January 1961. Under the provisions of paragraph 72, AFR 36-12, you will be released from active duty on 31 July 1961.
2. Your records show that you not retirement under 10 USC 8911 on that date nor will you be eligible to be retained on active duty to qualify for retirement under that law. Therefore, you will be released from extended active duty involuntarily on your established separation date unless:
$ # $ $ 9
3. Since you are being separated involuntarily, you are eligible for readjustment pay. (See paragraph 8, AFR 36-12, as amended).
* * * * *
5. Release under this criteria does not affect your appointment as a Reserve officer of the Air Force nor will it preclude you from participating in the Reserve program, if eligible. You may also 'apply for enlistment in the Regular Air Force if you are eligible under AFM 39-9.
43. By letter dated June 16, 1961, the Department of the Air Force responded to a Congressional inquiry as follows:
This is in response to your expression of interest in behalf of Captain Dante S. Reale, with regard to his release from active duty.
Only officers clearly an assume and discharge duties and responsibilities commensurate with their grade are permitted to continue *613 to serve in that grade. Officers who do not measure up to desired standards _or whose capabilities have been exceeded but whose elimination is not warranted will be considered for demotion by boards of officers. Reserve officers whose manner of performance of duty warrants demotion, but who are serving on active duty in a grade equal to or lower than their Reserve grade, cannot be demoted and, accordingly, in lieu of demotion they must be involuntarily released from active duty.
In October 1960, the Commander, Pacific Air Forces, recommended that Captain Reale be considered for demotion as a result of his failure to demonstrate a degree of over-all effectiveness commensurate with his grade. A demotion board composed of senior officers in Air Force Headquarters carefully reviewed Captain Reale’s complete military record and determined that he should be demoted.
Demotion is precluded by law since Captain Reale is serving on active duty in a grade equal to his permanent Reserve grade. In view or this, the demotion board recommended his release from active duty. The findings and recommendations of the board were approved by the Secretary of the Air Force, and Captain Reale is scheduled for release from the Air Force on July 31,1961.
I hope this will explain the Air Force procedure and action with respect to Captain Reale’s release from active duty. Your interest in this matter is appreciated and if I can advise you further, please let me know.
44. Plaintiff was released from active duty effective July 31, 1961, by orders dated July 27, 1961, citing as authority therefor Paragraph 72 of AFR 36-12 (see finding 50).
45. On or about July 25, 1961, plaintiff submitted to the Inspector General, Headquarters, Fifth Air Force, an appeal for redress under Article 138 of the Uniform Code of Military Justice, which appeal was rejected on September 8, 1961.
46. By letter dated August 23,1961, the Department of the Air Force, Directorate of Military Personnel, advised plaintiff’s mother in pertinent part:
1. General LeMay has ashed me to reply to your letter of August 12, 1961, concerning the release of your son, Captain Dante S. Reale.
2. The Chief of Staff received and considered your son’s communications and, as a result, the circumstances *614 involved with bis release were completely reviewed. It was determined tbat there was no basis for altering the original decision and tbat a personal bearing would serve no useful purpose. This information was furnished Captain Eeale on August 2,1961.
■3. The Secretary of the Air Force has statutory authority to release a reserve officer from active duty at any time. This authority is not used indiscriminately, however, and no officer is released involuntarily without a careful evaluation of all the factors involved. In your son’s case, he was recommended for release by the Commander, Pacific Air Force. He was then considered by a board of senior, impartial officers convened at this Headquarters. These officers were especially chosen on the basis of their experience and mature judgment, and were aware of the serious consequences of their actions. They had the opportunity to review Captain Eeale’s entire record of service and to compare it with those of over 2000 of his contemporaries. They determined that his overall record of performance did not measure up to the minimum standard set by other officers of equal grade and service, and recommended that he be released from active duty. The board’s recommendation was then approved by the Chief of Staff and the Secretary of the Air Force.
4. A decision to release an officer under these circumstances is made on the basis of the individual officer’s record and a consideration of the interests and needs of the Air Force. It would not be feasible to provide a personal hearing for each of the many hundreds of officers who are involuntarily released from active duty each year as a result of board action. The selection folder of the individual must speak for itself. This folder consists of informational and historical data such as the Officer Qualification Eecord, and opinion data such as letters of appreciation and commendation and effectiveness reports. In addition, the board which considered your son had before it the rebuttal information which he was given the opportunity to submit when it was brought to his attention that his reports contained indications that his performance was not meeting the desired standards. This is one of the procedures which the Air Force has established to protect individual rights. Another is the Officer Personnel Eecords Eeview Board. Any officer who feels that any part of his record is inaccurate, unjust, or unfairly prejudicial may appeal to the board for correction or removal of the offending portion. Your son made application to the Eecords *615 Beview Board; however, the board found that insufficient evidence was submitted to find the record unjust as constituted and denied the appeal.
5¡* í]í í]?
47. On September 17,1962, and again on or about July 19, 1964, plaintiff filed applications with the Air Force Board for the Correction of Military Becords wherein he requested the removal from his records of certain derogatory officer effectiveness reports, and revocation of the orders releasing him from active duty. Plaintiff further requested therein- restoration to active duty with full pay and allowances from July 31, 1961. These applications were denied by the Air Force Board for the Correction of Military Becords under dates of October 23,1962, and December 15,1964.
48. The record in this case contains some documentary evidence and testimony of an unclear nature indicating that during undeterminable periods of time prior to the dates on which the Air Force Board for Correction of Military Becords denied plaintiff’s applications, plaintiff’s August 3, 1960 rebuttal letter (finding 34) and certain other documents assertedly essential to a determination of his applications, as well as documents showing how the process for plaintiff’s release from active duty was initiated, were missing from his Master Personnel File. However, it cannot be found on the basis of the evidence that the documents in question were not in said file at the times the Correction Board was considering one or -both of plaintiff’s applications and decided to deny the same.
49. Air Force Begulation No. 36-35, dated April 8, 1960, entitled “Officer Personnel, Belease From Active Duty and Demotion of Officers,” provided in pertinent part:
3. Policy on Demotion or Belease from Active Duty: a. Each officer on active duty is expected to contribute to the accomplishment of the Air Force mission to a degree commensurate with his grade and rant. An officer who does not clearly demonstrate an ability and a willingness to accept and discharge the responsibilities and duties associated with his grade and rank will be demoted or released from active duty.
*616 c. * * * A release from effective not earlier than 90 days after the date the officer is notified. * * *
* * * * *
4. What Demotion or Release Means to an Officer:
* % * * *
c. An officer of the Reserve forces serving in a grade equal to or lower than his permanent Reserve grade will be released from active duty if he is not qualified for the grade in which serving.
5. Reasons for Demotion or Release Consideration. The following >or similar reasons warrant action against an officer under this regulation:
a. Failure to:
(1) Show acceptable qualities of leadership, professional (including technical) proficiency, or efficiency commensurate with his grade.
(2) Discharge properly the assignments required of an officer of his grade.
b. A progressive falling off of duty performance resulting m an unacceptable standard of efficiency.
c. A record of performance which is substantially inferior to that of the majority of his contemporaries, as indicated by a comparative analysis of Effectiveness Reports.
d. Becoming a “deferred officer” as defined in Sections 8303(a) and 8368 (a), Title 10, U.S.C., or being placed in the status described by Section 561, Title 10, U.S.C.
Hi * * # #
6. Who Initiates Action Under This Regulation. Major air commanders and the Deputy Chief of Staff, Personnel Headquarters USAF, may initiate action under this regulation.
a. Major air commanders submit the names of officers referred to in paragraph 5a, b, and c to Headquarters USAF (AFPMP-4A). Dates for submitting names are announced approximately 90 days before the boards convene. When officers are identified for consideration under this regulation before the announced dates for nominations, their names will be carried on the command Control Roster (see AFR 36-40) and recommendations forwarded at the proper time. Each recommendation will:
(1) State concisely the specific reasons for recommending demotion or release from active duty.
(2) 'Contain a copy (Thermofax or equivalent) of the officer’s latest effectiveness report. * * *
*617 c. A commander at any echelon may recommend for consideration under this regulation an officer whose current duty performance is substandard. Such recommendations are forwarded through channels to the major air commander who determines whether formal action should be initiated.
7. Board of Officers:
a. The Chief of Staff, USAF, periodically appoints boards of officers to consider officers for demotion or release. Normally these boards are convened concurrently with the annual permanent promotion programs.
b. Board members must be serving on active duty in a higher grade than any officer being considered for demotion or release and must be senior in permanent grade.
c. A board considering Reserve officers will include members from the Reserve components of the Air Force. Unless the Chief of Staff, USAF, determines it impracticable, at least one-half of the board membership will be Reserve of the Air Force officers.
8. Action of the Board. An officer recommended in accordance with paragraph 6 is considered by a formally convened board of officers, which reviews his record of performance, as contained in his selection folder and any other pertinent documents. The board evaluates each officer in the light of the policy set forth in paragraph 3 and then makes one of the following determinations :
# ❖ ‡ ❖ #
b. Reserve of the Air Force Officer:
SI) “Demotion is recommended.” (See paragraph l 2) “Release from active duty is recommended.” (See paragraph 4c.)
(3) “Demotion or release from active duty is not recommended.”
9.Processing the Report of Board Proceedings. The Director of Military Personnel, Headquarters USAF, submits the report of board proceedings to the Office of the Secretary of the Air Force for decision. The Director of Military Personnel, Headquarters USAF, initiates action to carry out the decision in each case.
$ $ $ $ *
15. Orders:
$ $ $ $ $
b. Releases of officers from active duty are announced in orders published by the appropriate headquarters in accordance with AFM 10-8.
*618 50. AFE 86-12, dated July 1,1960, as changed by 12A, dated October 5, 1960, entitled “Officer Personnel, Administrative Separation of Commissioned Officers and Warrant Officers of the Air Force,” provided in pertinent part:
72. Eeserve Officers Selected for Eelease under AFE 36-85. AFE 36-35 outlines procedures for releasing Eeserve officers from extended active duty for inefficiency and other related reasons. Subject to the limitations contained in paragraph 9, those officers who are selected for release under that regulation will be released from extended active duty under this paragraph not later than the first day of the seventh month after the Secretary of the Air Force approves the recommendation of the board of officers which selected them. They will be entitled to readjustment pay provided they are otherwise eligible as outlined in paragraph 8. (SDN 711)
51. AFE 36-40, dated July 17,1958, 'as amended by AFE 36-40A, issued May 25,1960, entitled “Officers Control Procedure”, states its purpose as establishing “procedures to identify and initiate control action on officers and warrant officers whose conduct or duty performance requires special attention. It also provides for observation periods aimed at improving the officers’ performance.” It provided in part:
1. Maintaining a Control Eoster. Commanders * * * will maintain a Control Eoster of officers whose performance is substandard or marginal as explained in paragraph 2. Commanders at any level may recommend that an officer’s name be placed on the appropriate command Control Eoster. While an officer’s name is on a Control Eoster, he is ineligible for PCS reassignment * * *.
2. When an Officer’s Name Will Be Placed on a Control Eoster. An officer’s name will be placed on a Control Eoster when:
a. His temporary promotion is withheld, for cause.
b. His name has been removed from a list of those selected for temporary or permanent promotion, for cause.
c. He becomes a “deferred” officer by reason of failure of selection for permanent promotion to grades of * * *.
d. He fails of selection for temporary promotion in the primary zone to grades of * * *.
e. He receives a report containing an entry made in the boxes of Section IV, AF Form 77, “USAF Officer Effectiveness Eeport,” below the “dependable and *619 officer” block, a derogatory report, or a report which any commander considers is substantially below the standards expected of an officer of his grade. * * *
f. His conduct or current performance of duty warrants such action. Major commanders may establish criteria on which to 'base this decision. * * *
g. Directed by Headquarters USAF or the major air commander concerned.
h. He fails at any school when attendance at such school is at Government expense, if such failure can reasonably be traced to factors over which the officer had control.
3. Documents To Be Reviewed. Each commander * * * will insure:
a.That the records of all assigned officers are reviewed periodically to determine whether any officer’s performance or conduct warrants elimination, demotion, or special observation. * * *
❖ ❖ ifi %
4. Procedures for Placing Officers on the Control Roster:
a. When a commander * * * receives a derogatory or substandard effectiveness report on an officer, or receives other evidence listed in paragraph 2, he will:
(1) Initiate punitive or administrative action, and/or
(2) Place the officer’s name on the Control Roster. As soon thereafter as is practicable, the officer will be notified in writing * * * that he will be observed and will be under the supervision of the reporting official for 120 days * * *.
b. Upon completion of the 120 days under supervision of reporting officer, effectiveness report will be made to record the officer’s performance. * * *
c. Upon receipt of the special effectiveness report at the end of the observation period, the commander will take action as follows:
(1) If the report indicates that the officer’s performance has risen to accepted standards, the officer will be notified in writing * * * that he has been removed from the Control Roster. * * *
(2) If the report indicates that the officer’s performance is still substandard but does not warrant demotion or elimination, the officer may be placed under a second period of observation. * * * The second period of observation will be under a different reporting officer who is not *620 or wbo rendered tbe report on the original period of observation. * * *
d. When the first or second report indicates that the officer should be demoted, released from active duty in lieu of demotion (Reserve officers only), or eliminated, the commander will initiate action under appropriate regulations. Officers identified for demotion or release from active duty consideration will be retained on the Control Roster without requirement for additional observation, until final action has been accomplished under the provisions of AFR 86-35. * * *
‡ sg: $ ‡ ‡
6. Procedures When Releasing or Reassigning Officers Who Are on a Roster. For officers who are released from active duty or who are reassigned while their names are on a Control Roster, the following action will be taken: a. Officers who are released from active duty:
The losing command will forward a summary of the facts in the case to the Commander, Air Reserve Records Center * * * for consideration of action under AFR 45-40. In the case of an ANGUS officer, the Chief, National Guard Bureau * * * should be notified.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 47 (c).

 Dated July 17, 1958; amended by AFR 36-40A of May 25, 1960. For convenience, the regulation as amended will be referred to as AFR 36-40.

 Finding 37 has the full text of this letter.

 Dated April 8, 1960.

 It is not entirely clear from the record just what procedures led to the action under AFR 36-35» especially whether the decision was initiated by plaintiff’s Wing Commander, by the Fifth Air Force, or independently by the Commander of the Pacific Air Forces or his staff.

 The adverse Correction Board determinations are irrelevant to our decision for, as -will appear, plaintiffs release from active duty was in violation of tie Air Force’s own regulations. It should never have been necessary for him to go to the Correction Board for relief at all, and that Board could not cure the legally defective release. See Friedman v. United States, 141 Ct. Cl. 239, 252—54, 158 F. Supp. 364, 373-74 (1958) ; Morris v. United States, 103 Ct. Cl. 259, 260 (1963) ; Wason v. United States, 179 Ct. Cl. 623, 631 (1967) ; Biddle v. United States, 186 Ct. Cl. 87, 107 n.* (1968) (concurring opinion).

 It is undisputed that the Air Force was required to follow its own regulations in releasing plaintiff. Roberts v. Vance, 343 F. 2d 236 (C.A.D.C. 1964). It is also plain that, if the release was defective because in violation of regulations, plaintiff is entitled to recover back pay. See, e.g., Murray v. United States, 154 Ct. Cl. 185 (1961) (AFR 39-10) ; Smith v. United States, 155 Ct. Cl. 682 (1961) (Navy Bureau of Personnel Manual) ; Sofranoff v. United States, 165 Ct. Cl. 470 (1964) (Marine Corps Manual) ; Rowe v. United States, 167 Ct. Cl. 468 (1964) cert. denied, 380 U.S. 961 (1965) (discharge upheld under AFR 39-17) ; Cole v. United States, 171 Ct. Cl. 178 (1965) (AFR 36-2) ; Hankins v. United States, 183 Ct. Cl. 32 (1968) (AFR 36-12).

 The pertinent text of AEK 36-40 is set forth in finding 51.

 See finding 49 for the specific pro-visions. It is significant tliat none of the four categories relate to a general reduction-in-force. This lack of authority-under AFR 36-35, together with statements by the Air Force justifying plaintiff’s release on the basis of his individual failings rather than an across-the-board reduction in personnel (see findings 43 and 46), conclusively rebut the defendant’s contention that Reale’s release was part of a general “R.I.F.” (of which, according to defendant, he could not complain).

 Dated November S, 1957; amended by AFR 36-2A issued June 27, 1960. The amended regulation will be referred to as AFR 36-2.

 Defendant argues that plaintiff has little reason to complain of a release from active duty, since he was not “discharged” completely from the Air Force, but retained his reserve status. The Air Force regulations clearly consider release a serious action; in practical terms it often means the end of an officer’s active career and can affect his retirement and emoluments.

 Plaintiff would imply sueli rights from the requirement in paragraph 6a that officers identified for consideration be carried on the command Control Roster.

 Plaintiff’s right to seek review, before the Officer Personnel Records Review Board, of derogatory Information in his record was an ineffective remedy— the Review Board’s action (on December 20) was after the APR 36-35 board had recommended him for release from active duty. Nor would such an appeal provide an opportunity to present'arguments concerning a specific contemplated adverse action.

 E.g., assignment within the command to other duties, restriction of activities, special training programs, stronger supervision, etc.

 This Is, of course, precisely what happened in plaintiff’s case. The AFR 36-35 board acted without any information on the 120-day trial period.

 This is certainly not a case where different conduct is the Basis for two contemporaneous yet unrelated personnel actions or where, with clear sanction in regulations, two separate procedures are instituted against an employee, with full notice to him of the institution and causes for both. Nor would it help the Air Force here if it could show that the two actions were instituted by different commanders (the record does not show the origins of the AFR 36-35 “nomination”). The service’s left hand is bound to know what its right hand is doing in this area (cf. J. A. Jones Constr. Co. v. United States, 182 Ct. Cl. 615, 390 F. 2d 886 (1968) ; L. W. Foster Sportswear Co. v. United States, 186 Ct. Cl. 499, 405 F. 2d 1285 (1969)), and the regulation would be as surely violated by two separate officers’ actions as by that of a single commander.

 Plaintiff’s request for reinstatement (in addition to back pay) must, of course, be denied since we lack the power to give that remedy.