Richard S. BUCHANAN

v.

The UNITED STATES.

No. 130–75.

United States Court of Claims.

April 2, 1980.

Donald D. Chapman, Arlington, Va., for plaintiff.

Emory J. Bailey, Wheaton, Md., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Francis H. Clabaugh, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

SMITH, Judge:

Plaintiff, Richard S. Buchanan,[1] a lieutenant commander in the United States Naval Reserve[2] presently on inactive duty, seeks by his motion for summary judgment to have this court overturn an adverse determination of the Board for Correction of

---

1. Hereinafter "plaintiff" or "LCDR Buchanan."    2. Hereinafter "USNR."

Naval Records[3] and enter judgment for plaintiff on his prayers for back pay, reinstatement, and correction of his personnel record with respect to certain officer fitness reports. Defendant has filed a cross-motion for summary judgment.

Plaintiff entered active duty as an ensign, USNR, of the unrestricted line,[4] on September 23, 1957, after having served as an inactive enlisted naval reservist from April 18, 1950, until receiving his commission in 1957. His active duty as an officer continued uninterrupted for 17 years 4 months, until his involuntary release to inactive duty on January 24, 1975. He was successively promoted to the ranks of lieutenant (junior grade), USNR; lieutenant, USNR; temporary LCDR, USNR; and permanent LCDR, USNR, on the respective dates December 7, 1958, June 1, 1961, March 1, 1966, and August 1, 1971. In 1964 (then Lieutenant) Buchanan applied for and was selected for duty in the Training and Administration of Reserves ("TAR") program, effective July 1, 1964, at which time his designator was appropriately changed to 1107 to reflect this change in his status. He served as a TAR officer until his release to inactive duty.

LCDR Buchanan was passed over twice for promotion to the rank of commander, USNR, once in March 1972 and again in February 1973.

Under date of August 19, 1974, the Chief of Naval Personnel notified plaintiff by letter that his name was among those reported to the Chief of Naval Personnel by the annual TAR Review Board as not recommended for continuation on active duty, and that plaintiff would be released not later than January 3, 1975. This letter assigned no cause or reason for the action of the TAR Review Board.

Under date of October 25, 1974, plaintiff's application for the relief prayed for herein was submitted to the correction board, accompanied by a brief with exhibits

attached, and was followed by a similar brief with exhibits attached on November 14, 1974. On January 6, 1975, the Chief of Naval Personnel provided the chairman of the correction board an advisory opinion recommending denial of plaintiff's application. This advisory opinion was furnished to plaintiff's counsel by letter of January 10, 1975, which letter afforded plaintiff an opportunity to submit additional evidence or a rebuttal, but no hearing. On January 17, 1975, plaintiff's counsel submitted an additional memorandum or letter in rebuttal. On January 22, 1975, three of the five members of the correction board, in executive session, considered plaintiff's case and denied his application by letter of that date addressed to plaintiff.[5] LCDR Buchanan's release to inactive duty followed promptly on January 24, 1975.

In sum, plaintiff argues that procedures used by the correction board were violative of plaintiff's due process rights, and that the correction board's action was arbitrary, capricious, not supported by substantial evidence, and contrary to law. Specifically, plaintiff contends that under Bureau of Naval Personnel[6] Manual article 1020200.4, the TAR program is a career program affording tenure to those officers who reach the grade of lieutenant commander or above, and that plaintiff's release, unless for cause, was illegal. We agree. Further, he contends that due process of law mandates that notice and opportunity to be heard are required as a part of any decision-making process which removes an individual from his career. Although we cannot agree that the requirements are as broad and absolute as plaintiff suggests, we hold that notice and opportunity to be heard are required in correction board proceedings such as those involved herein. Third, plaintiff claims that his allegations of inaccurate or unjust portions of certain fitness reports were not duly considered by the correction board. We conclude that we

3. Hereinafter "correction board."

4. "Designator 1105." As will be noted, "TAR" designators end with the number "7."

5. See Appendix A.

6. Hereinafter "BuPers."

are unable to resolve this issue on the basis of the facts presently in the record.

### I.

After an exhaustive examination, we find the only regulation governing the subject of retention in the TAR program to be that contained in Bureau of Naval Personnel Manual article 1020200. Though this article was the basis for the TAR board action against plaintiff, it contains no specific standards for retention. A brief history of the TAR program must be undertaken in order to determine if the claim of "tenure" by plaintiff is a valid one.

The TAR program in its present form came into being in 1958 as a result of several years of planning within the Bureau of Naval Personnel. The problems facing the program planners included the fact that the Navy was required by law under 10 U.S.C. § 265 to maintain reservists on active duty to participate in preparing and administering the policies and regulations affecting the Naval Reserve. Unfortunately, Naval Reserve officers were leaving at the end of their obliged active duty service in such numbers that there developed a shortage of Reserve officers in the rank of lieutenant commander or above. Active duty agreements proved inadequate as an incentive to middle-grade Reserve officers to remain on active duty.

As a direct consequence, planners sought to increase the special readjustment payment to be made upon separation to Reserve officers who would stay on active duty for a period of 12 years. This was accomplished by the Armed Forces Reserve Act of 1952, *as amended* by Pub.L. No. 84–676, approved by Congress on July 9, 1956. Further, it was decided that at the end of the twelfth year, the Reserve officers would be removed from the lineal list and offered three options. First, the Reserve officer would be offered a career in the Regular Navy, if selected. Secondly, the officer could choose a career in the TAR program as a Reserve officer, if selected. And lastly, if the officer was not approved for either of the two programs above, he would be released to inactive duty with readjustment pay.

The administrative implementation of the 1958 revisions to the TAR program were presented to the Secretary of the Navy and approved. BuPers Instruction 1001.10C was published as a result on July 23, 1958.

Prior to the issuance of this instruction, the scope of the TAR program was stated in BuPers Instruction 1001.10B (1957) as follows:

> * * * *Scope.* The TAR Program provides a career pattern for Reserve officers on active duty. *The long-range plan envisions only TAR officers being retained on active duty in the grades of lieutenant commander and above.* Officers selected for TAR designation may, therefore, have a reasonable expectation of a gratifying career in an extremely important functional area of the Navy, and may anticipate a promising opportunity to qualify for retirement upon completion of 20 years active duty. [Emphasis supplied.]

The scope of the program was expanded by BuPers Instruction 1001.10C (1958) and reads as follows:

> * * * *Scope.* The TAR program provides the most reasonable career opportunity for Reserve officers on active duty. The long range plan for the program envisions a continuing requirement for TAR officers being retained on active duty in grades of lieutenant commander and above to administer the Reserve training programs. Officers selected for TAR designation may, therefore, expect a good possibility of retention on active duty to pursue a challenging career in an extremely important functional area of the Navy. *Normally, the TAR officer may expect to retire upon completion of 20 years of active duty.* However, in order to provide for a continuity of mature experience in TAR matters, as a retention incentive for junior Reserve officers, and as a means of insuring continuation on active duty of a group of highly selected candidates who may aspire to the TAR rear admiral billet, there is estab-

lished a program whereby a small number of outstanding senior TAR officers will be extended beyond 20 years on active duty, with an opportunity for retention to 30 years and consideration for flag rank. [Emphasis supplied.]

BuPers Instruction 1001.10D, dated October 30, 1959, which was in effect when plaintiff entered the program, provided on the subject of retention:

11. *Retention.* TAR status, in itself, embodies no active-duty retention guarantee, and it must be recognized that should possible future strength reductions necessitate release from active duty of any Reserve officers, TAR officers must compete for retention with other Reserve officers having similar designators. * *

BuPers Instruction 1001.10D including the above reference to retention was canceled by BuPers Instruction 1001, dated June 2, 1966. The revised regulation, now appearing as BuPers Manual article 1020200, has governed the program ever since. It should be noted that since 1975, the Bureau of Naval Personnel has followed a policy that active duty agreements would not be issued to TAR officers. Since the cancellation of BuPers Instruction 1001.-10D, the subject of retention in the TAR program has somehow never been specifically readdressed by regulation. The only existing regulation affording guidance is article 1020200 of the Manual for the Bureau of Naval Personnel which states at paragraph 1.d:

The TAR Program offers the Reserve officer an *opportunity* to fulfill a 20-year active duty career. * * * [Emphasis supplied.]

It is this word "opportunity" that has generated so much controversy in the present case.

## II.

In our attempt to determine what the word "opportunity" was intended to mean in BuPers Manual article 1020200, the correction board has been very helpful.

In the *Application of Lieutenant Commander Joe W. Snyder,* USNR (*Snyder*), decided by the board on June 14, 1972, and approved by the Secretary of the Navy on June 21, 1972, the board found that Snyder was summarily and unjustly removed from the TAR program without recourse and placed on the lineal list with a 1615 designator. The board found that this action constituted such error and injustice as to warrant corrective action:

[I]t was clearly the intent of the Chief of Naval Personnel that because of the elimination of the 1617 (TAR) community that each officer affected be individually contacted and offered the option of transferring to the lineal list, transfer to 1107/1317, or transfer to the Retired List. * * * Such opportunity, however, was not offered Petitioner as intended and authorized * * *. * * * In addition by this unjust action, it may be pointed out that Petitioner's removal from the TAR program undoubtedly adversely affected the possibility of retention on active duty in that, *by his transfer to the 1615 community he was more susceptible to the processes of attrition* than in his former status. * * * [Emphasis supplied. Letter of the board to the Secretary of the Navy, dated June 14, 1972, ¶ 5 on page 3.]

As support for its finding, the board noted and summarized the argument before it of Rear Adm. Alexander Jackson, Jr., U.S.N. (Ret.), who had supervised the initial planning for the TAR program when he was serving as Assistant Chief of Personnel for Naval Reserve:

* * * That the Tar Career Plan upon completion was approved by the Secretary of the Navy, with the knowledge that he was approving a plan for the TAR's comparable to that available to the regulars and that those officers entering the TAR program would be continued on active duty until they had completed 20 (or more) years—*unless released for cause.* * * *[A] long range policy had been established, adhered to through today, which *provides tenure for officers selected into the TAR program for a 20*

*year career,* and a longer one on a selective basis. * * * [S]uch policy had been codified as recited in paragraph 1.d. BuPersMan Article 1020200 as follows:

"The TAR program offers the Reserve Officers an *opportunity* to fulfill a 20 year active duty career. * * *" [Emphasis supplied.]

In addition, the correction board's letter of June 14, 1972, contained the following summary:

Rear Admiral [William C.] Hughes testified that he subsequently had assumed the duties of Assistant Chief for Naval Reserve and carried on the program as had been established during the tenure of Admiral Jackson with the concurrence of the Secretary of the Navy—and that the TAR program, by regulation, provided *about the same security for 20 year retirement as a regular officer.* [Emphasis supplied.]

It is clear from the conclusions of the correction board in *Snyder* that the board had itself accepted the position that TAR officers were to be treated essentially in the same manner as Regular naval officers and could be removed only for cause.

Admiral Jackson submitted a brief in that previous case in which he stated:

Those in the Bureau of Personnel who are responsible for generating and defending this release program have confused the word "guarantee" with "tenure."

Regular officers and TAR officers have tenure. Regular officer tenure was established years ago during the formative period of the Navy.

TAR officer tenure was established beyond doubt in late 1957. * * *

Admiral Jackson, as one of those responsible for the development of the program, traced the development of the TAR program from its inception. Originally the TAR program was an offshoot of what was known as the Guest Plan.[7] As Admiral Jackson stated further:

* * * [T]he action taken here was of deep concern to higher ranking officers, who bore the responsibility for the well being of the Reserve program * * *.

In rebuttal to this view of the TAR program, defendant asserts that 10 U.S.C. § 681 allows the Secretary to release reservists from active duty at his discretion, and therefore plaintiff could be released without cause. However, the Secretary himself approved the 1958 revisions of the TAR program including its "tenure" provisions. As Admiral Jackson stated in his brief in *Snyder*:

The TAR Career Plan was completed and presented to the Secretary of the Navy who approved it in late 1957. In approving it the Secretary was aware that he was approving a career plan for the TARS comparable to that available to the Regulars. He knew that reserve officers entering the TAR program would be continued on active duty until they had completed twenty years of active duty, unless released for cause.

Since it appears clearly that this policy has been codified in BuPers Manual article 1020200, the Secretary cannot now attempt to claim a right to release plaintiff in contravention of his own regulations, by which he is bound[8] and which have the force and effect of law.[9]

In looking at the options open to an active duty Reserve officer who was being taken off the lineal list after 12 years of active service, there is no dispute that the officer had to be selected into either the TAR program, or the Regular Navy, or

---

7. So-called for Rear Adm. William S. Guest.

8. *Service v. Dulles,* 354 U.S. 363, 380, 77 S.Ct. 1152, 1161, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 270, 74 S.Ct. 499, 504, 98 L.Ed. 681 (1953); *Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012 (1958); *see also United States v. Heffner,* 420 F.2d 809, 812 (1970).

9. *Dorl v. United States,* 200 Ct.Cl. 626, 633, cert. denied, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *see also Henneberger v. United States,* 185 Ct.Cl. 614, 627, 403 F.2d 237, 244 (1968).

released to inactive duty. If the TAR program was not a tenured program, the selection of an officer into that program would be meaningless. His selection would give the officer no measure of security, in one respect, in comparison to a Reserve officer or a Regular officer on the lineal list. While on the lineal list an officer would be subjected to consideration for release, other than for cause, only when failing of selection for promotion, whereas the TAR officer submits to an *annual* review of his desirability for retention. Under defendant's theory, officers would be courting involuntary release at annual intervals in the future by applying to the TAR program at this critical junction in their career. No sane Reserve officer, seeking a career in the Navy, would apply to the TAR program in lieu of the Regular Navy, if there were no hope of tenure, and if there were an annual risk of summary release without notice or opportunity to be heard. Our ruling does not, as defendant insists despite the statement to the contrary by Admiral Jackson, result in "guaranteeing" all TAR officers active duty for 20 years. The TAR program offered security to those of lieutenant commander and above, *"comparable to"* (in the words of Admiral Jackson), or (in the words of Admiral Hughes) *"about* the same as" that offered to Regular naval officers. It should be remembered that any officer, Regular or Reserve, tenured or under contract, at anytime can be removed for cause.

The distinction between "opportunities" offered Regulars and TAR's suggested by Admirals Hughes and Jackson, appears to lie in the *annual* review to which TAR officers were subject and to which Reserves under agreement and Regulars were not. The difference in tenure lies in the frequency of review and the consequent potential for separation for cause.

A closer look at the policy concerns behind the TAR program shows not just the *need* for tenure, but it can be inferred that the Navy *considered* it a tenured program. First, since 1975, the Bureau of Naval Personnel has followed a policy that active duty agreements would not be issued to TAR officers. Since LCDR Buchanan had no active duty agreement, defendant argues that plaintiff had no right to a hearing and his application to the correction board could be dismissed without explanation under 32 C.F.R. § 723.3(e) (1975).[10] This argument it totally unsupportable.

The Armed Forces Reserve Act of 1952, Pub.L. No. 476, 66 Stat. 481, was the original legislation that mandated that steps be taken to retain Reserve officers on active duty in the armed forces. Under that public law, the discretion of the Secretary was paramount and reservists could be released from active duty at his discretion. However, section 235(a) of that act states that active duty agreements would be available to reservists "[i]n order that members of the reserve components may remain on or

---

10. 32 C.F.R. § 723.3(e) provides:

"(e) *Consideration of Application.* (1) Each application and the available military or naval records pertinent to the corrective action requested will be reviewed to determine whether to authorize a hearing, recommend that the records be corrected without a hearing, or to deny the application without a hearing. The Board will make this determination in all cases except those in which the application has been denied administratively for the reason that the applicant has not exhausted all other effective administrative remedies available to him, or for the reason that the applicant did not file his application within 3 years after he discovered the alleged error or injustice and did not submit any reason why the Board should find it to be in the interest of justice to excuse the failure to file the application within the prescribed 3 years.

"(2) The Board may deny any application if it determines that insufficient relevant evidence has been presented to demonstrate the existence of probable *material error or injustice.* The Board will not deny an application on the sole ground that the record was made by or at the discretion of the President or the Secretary in connection with proceedings other than proceedings of a Board for the correction of military or naval records. Denial of an application on the grounds of insufficient relevant evidence to demonstrate the existence of probable material error or injustice is without prejudice to further consideration in the event new and relevant evidence is submitted. The applicant will be informed of his privilege to submit newly *discovered relevant evidence for consideration.*

"(3) When an application is denied without a hearing, written findings, decision and recommendations are not required."

be ordered to active duty voluntarily for terms of service of definite duration." The fact that the Bureau of Naval Personnel discontinued active duty agreements with TAR officers would indicate the Navy's recognition that the TAR program is a tenured program; otherwise this court would improperly have to infer that the Navy contravened the provisions of section 235 of the 1952 act. As Admiral Jackson stated in the *Snyder* appeal, the Navy was unable to fill the statutory requirement (for utilization of Reserve officers) of 10 U.S.C. § 265 and therefore the need for a career incentive existed. If the TAR program never offered tenure, the Secretary, absent an active duty agreement, could arbitrarily destroy a TAR officer's career in a period most critical to the individual. The Secretary by denying active duty agreements to TAR officers would be in violation of the statutory requirement for the same in section 235, and could also be considered in violation of the utilization provisions of 10 U.S.C. § 265. Moreover, junior officers, not in short supply, could receive protective active duty agreements for periods up to 5 years, whereas officers in their middle years, the need for whom was the *causa sine qua non* of the program, would have no substantive security whatsoever.

█ We are not compelled to reach those absurd conclusions. It is clear that the TAR program offered its officers of the rank of lieutenant commander the "opportunity" to continue on active duty until completion of 20 years of active service, unless sooner released for cause. The board could not find otherwise without totally disregarding the evidence available to it and upon which it relied in *Snyder*. Plaintiff herein submitted to the board an affidavit by Admiral Jackson reaffirming the

statements made by him in *Snyder*, and offering to appear in LCDR Buchanan's case "as a witness for him at his hearing." No such hearing was afforded. LCDR Buchanan, being a TAR officer having tenure as described by Admiral Jackson, could not be released without his consent unless given opportunity to be heard.[11]

### III.

█ Plaintiff has also alleged that the correction board acted illegally in depriving him of his due process rights to notice and hearing under the fifth amendment of the United States Constitution when it denied LCDR Buchanan's appeal without a hearing and without a written factual determination of the issues presented to it. The Government contends that plaintiff was not serving under an active duty agreement, and thus the correction board was within its rights to deny plaintiff's application without an opportunity to be heard under 32 C.F.R. § 723.3(e). It is argued by defendant that under 10 U.S.C. § 681(a) the Secretary had the right to release Reserve officers at his discretion, and thus plaintiff was not tenured and had no property interest that he could have been deprived of without due process of law. We do not find it necessary or appropriate in this case to reach the constitutional issue raised by plaintiff.[12] Since plaintiff was serving under tenure, he was serving at least as if under an active duty agreement and the Secretary cannot release him without an opportunity to be heard.[13]

The application of 32 C.F.R. § 723.3(e) is improper in this instance. That regulation allows the correction board to deny an application without making specific written findings of fact, or allowing a complainant

---

11. In *Fiorentino v. United States*, 221 Ct.Cl. ——, 607 F.2d 963 (1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980), we held, citing *inter alia Sims v. Fox*, 505 F.2d 857 (5th Cir. 1974), that an agency cannot create "tenure" contrary to statutes that govern the agency unlike those cases, in the instant case the TAR program and its accompanying policy of tenure were developed by BuPers and approved by the Secretary of the Navy at a time

when Reserve officers could not, without the security of tenure, be provided to meet statutorily mandated requirements for utilization of such officers.

12. *See United States v. Clark*, 445 U.S. ——, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980).

13. *Henneberger v. United States*, 187 Ct.Cl. 265, 266, 407 F.2d 1340, 1341 (1969).

a hearing, when in its discretion it is concluded that there is insufficient evidence of error or injustice to warrant corrective action, but only after *each* application has been reviewed to determine *whether* to authorize a hearing. That determination is not to be made in a vacuum, purely at the discretion of the board. Since we find that the TAR program was in fact a tenured program, offering a career "opportunity" to its officers, it was error for plaintiff's application to be denied without giving him an opportunity to be heard.

In *Hagopian v. Knowlton* [14] a cadet of the United States Military Academy was about to be separated because he had a surplus of demerits. The Court of Appeals for the Second Circuit concluded that before severance the cadet was entitled to notice, a hearing, and an opportunity to present evidence in his behalf. Plaintiff, in that case, was in a career program and it was ruled that such a person deserved no less than these procedural safeguards. In *Wasson v. Trowbridge*, a case involving a cadet of the Merchant Marine Academy, that same court stated: [15]

> * * * [D]ue process only requires for the dismissal of a Cadet * * * that he be given a fair hearing at which he is apprised of the charges against him and permitted a defense. * * *

The standard of retention stated in *Hagopian v. Knowlton* was whether the cadet's "potential warrants retention." The second circuit in addressing this standard of review stated: [16]

> * * * With a cadet population of several thousand, it is unlikely that the members of the Board, drawn from several departments, would have a sufficient acquaintanceship with the cadet to be able to appraise him or determine his "potential for retention" merely on the basis of his letter to it. The opportunity to bring witnesses to appear in his behalf

may also strengthen the impact of his case above the frail impression which a written submission would make. * * *

Similar considerations apply to the case at bar. Irrespective of any constitutional question, it seems apparent that a career officer having tenure should at least have the safeguards offered to a cadet in a career program. The standards of review for retention in either case are sufficiently vague to warrant a hearing, especially in light of the irreparable harm that might befall the individual.

The Supreme Court in *Goss v. Lopez* stated: [17]

> * * * "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . ." "Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Committee v. McGrath*, [341 U.S.] at 170, 171–172 [, 71 S.Ct. at 647–649] (Frankfurter, J., concurring). [Footnote omitted.]

Whether the complainant in danger of losing his career is a cadet or, as in the case of plaintiff, a lieutenant commander in his forties or late thirties with 17 years 4 months of active service, such person is handicapped from the outset by the fact that his fate lies in the hands of a military superior, a plain fact of service life which endows the superior with certain unassailable advantages which can tempt the superior to assume additional and unwarranted advantages if even the basic requirements of fairness can be ignored with impunity. The military, of necessity, is an organization in which the Golden Rule may not in all matters be substituted with ease for

14. *Hagopian v. Knowlton*, 470 F.2d 201, 207 (2d Cir. 1972).

15. *Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967); *see also Hagopian v. Knowlton*, *supra* note 14, 470 F.2d at 210.

16. *Id.*, 470 F.2d at 211.

17. *Goss. v. Lopez*, 419 U.S. 565, 580, 95 S.Ct. 729, 739, 42 L.Ed.2d 725 (1975).

standard operating procedures; however, the services cannot afford the risk of loss of trained personnel, in which they have a heavy investment of time and money, which can result from the unfettered and arbitrary exercise of authority.

■ Plaintiff submitted to the correction board substantial evidence upon which it would appear the board could have made a finding of personal bias or other error or injustice. We do not pretend to second-guess the board's decision; it is the failure of the correction board to give the slightest clue as to *how* it arrived at its decision that is the gravamen of its error. It is unfortunate that the correction board did not see fit to address the validity of the conclusions of Admirals Jackson and Hughes. Some guidance from the board would have made this court's duty a less arduous task. Even though LCDR Buchanan's application was submitted with substantial documentary evidence, plaintiff's release was simply stated to be "in the best interests of the Naval Service."

In a sense the military and the individual share a mutual interest in the protection of the latter's tenured position in the former. Long ago it was found necessary to give Regular officers tenure and reasonable assurance of retirement benefits in order to encourage them to preserve their service-acquired skills and experience for the benefit of the service, and to provide individuals with incentives to forego the opportunities otherwise available on the "outside" during the crucial middle period of one's productive years. The complexity of the modern armed services requires that incentives be provided to prevent their losing the indispensible expertise of their middle-career personnel, both officer and enlisted, as the Chief of Naval Operations has so testified in recent weeks in his appearances before the Congress. The very same concerns manifest themselves, although intermittently, with respect to the Reserve forces. This was the situation that existed when the TAR program was approved by the Secretary of the Navy. Such conditions can be expected to exist again. In such eventuality the services cannot expect skilled persons who may be critical to the needs of the services at that time to rely on those incentives if individual superiors may use the authority of their temporary positions to disregard policies and commitments of the services summarily by executive session, without notice, without hearing, and without explanation.

For the above reasons, the application of 32 C.F.R. § 723.3(e) by the correction board to the case at hand is found to be erroneous and inappropriate.

IV.

The correction board has stated that in the case of LCDR Buchanan its decision to dismiss summarily his petition is not inconsistent with its *Snyder* decision and that "its determination in one case does not constitute a binding precedent with respect to any other case."

The board in *Snyder*, as sometimes happens with triers of facts, "found" that Admiral Jackson testified and it summarized the content of such testimony, but it neglected to translate such unrebutted testimony and that of Admiral Hughes into true "findings of facts." This technicality cannot serve as a basis for disregarding the establishment by this unrefuted testimony of the fact that the TAR program was instituted as a tenured program. That the *Snyder* decision was compelled by this testimony is all too apparent.

Defendant has asserted that the decision whether or not to retain plaintiff on active duty is purely in the discretion of the Secretary under 10 U.S.C. § 681. The Government argues that the Secretary has the ultimate authority to determine what is appropriate, and this court can only reject the Secretary's decision if it was arbitrary, capricious, or contrary to substantial evidence. In other words, defendant states that there must be clear legal error.[18]

---

18. *Dunphy v. United States,* 208 Ct.Cl. 986, 989 (1975); *Doggett v. United States,* 207 Ct.Cl. 478, 482 (1975).

Defendant further contends that this court has no jurisdiction, if no monetary award can be made,[19] and that the petition must be dismissed. Defendant concludes that plaintiff cannot sustain his claim in this case since he cannot show legal error.

In response to the arguments presented by defendant, our decision in *Sanders* is most helpful.[20] In addressing the issue of our jurisdiction, this court stated:[21]

> * * * [T]he non contractual [footnote omitted] claims within our jurisdiction are of two types—those in which a plaintiff has paid money to the Government and seeks its return, and those claims in which money has not been paid, but the plaintiff nonetheless asserts that payment is due. * * *
>
>> "* * *. * * * In this [latter] type of case, we have held 'a claimant who says that he is entitled to money from the United States because a statute or a regulation [or the Constitution] grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable.' *Ralston Steel Corp. v. United States*, 169 Ct.Cl. 119, 125, 340 F.2d 663, 667 (1965), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723. [*Eastport S.S. Corp. v. United States, supra*, 178 Ct.Cl. 599 at 606, 372 F.2d 1002 at 1008.]"

In the case of LCDR Buchanan, it can be stated that he relied upon BuPers Manual article 1020200 which would give plaintiff at least an arguable position. The Government has argued that *Testan*[22] is applicable to the case at hand, and deprives the court

of jurisdiction; here, as in *Sanders*, this contention is rejected.[23]

Defendant claims that it is irrelevant whether an injustice has occurred in this case, citing, interestingly, our opinion in *Reale*.[24] Again this contention is rejected. As stated in *Sanders* :[25]

> * * * To recover for failure to correct an alleged injustice, * * * it must be proved that such failure was arbitrary and capricious, or in bad faith, or contrary to law, or without rational basis, seriously prejudicial to plaintiff, and with monetary consequences. In such event, the abuse of administrative discretion rises to the level of legal error which merits judicial relief. * * *

Thus, the ultimate question to be answered is whether the correction board acted arbitrarily, capriciously, or contrary to substantial evidence.

## V.

In examining this standard of review, this court has stated that:[26]

> * * * It is only where the decision of the board is clearly unsupported by substantial evidence or when there was a noncompliance with applicable laws and regulations that this court may interfere with the findings of the board. * * *

In *Boland v. United States*,[27] it was concluded that where there was substantial evidence supporting the findings of the board, plaintiff's claim must fail. It is well established that there is a presumption of validity to official military action taken

**19.** *United States v. Testan*, 424 U.S. 392, 407, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976).

**20.** *Sanders v. United States*, 219 Ct.Cl. ——, 594 F.2d 804 (1979).

**21.** *Id.*, 219 Ct.Cl. at ——, 594 F.2d at 809.

**22.** *United States v. Testan, supra* note 19; *see also Skinner v. United States*, 219 Ct.Cl. ——, 594 F.2d 824 (1979).

**23.** *Sanders v. United States, supra* note 20, 219 Ct.Cl. at ——, 594 F.2d at 810.

**24.** *Reale v. United States*, 188 Ct.Cl. 586, 590 n. 5, 413 F.2d 556, 558 n. 5 (1969).

**25.** *Sanders v. United States, supra* note 20, 219 Ct.Cl. at ——, 594 F.2d at 813.

**26.** *Furlong v. United States*, 153 Ct.Cl. 557, 563 (1961); *see also Cooper v. United States*, 178 Ct.Cl. 277, 288 (1967).

**27.** *Boland v. United States*, 169 Ct.Cl. 145, 148 (1965).

by correction boards.[28] It is further assumed that the correction board performed its function properly and considered all pertinent records relating to the particular individual.[29] Consequently, the plaintiff does have the burden to show that the board has not carried out its duties. This is not to say, however, that the board may summarily dismiss plaintiff's appeal by merely stating that plaintiff has such a burden and that he has not sustained it, as was done in the letter of January 22, 1975.[30]

In *Caddington*, it was determined that it is the board's duty to evaluate an error, the nature of the error, and to compensate such an injustice. As stated in that opinion:[31]

We feel that the Secretary and his boards have an abiding moral sanction to determine insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief.

Therefore, on the record before us, the question is whether the board's denial of plaintiff's application in this case was based on substantial evidence, viewed against the record as a whole.[32]

It is impossible for us to determine what consideration the correction board gave specific submissions that plaintiff presented to it, including Admiral Jackson's affidavit and references to the *Snyder* application. The court finds itself unable to determine the basis of the correction board's denial of LCDR Buchanan's appeal, since its decision was without any kind of discussion of the evidence presented to it. As stated in *Beckham* :[33]

* * * A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing * * * is inim-ical to a rational system of administrative determination and ultimately inadequate. * * * "In these circumstances * * we cannot give as much deference to the Board's determination as if it had given detailed findings to support, and fuller explanations of the reason for, its conclusion. * * *"

In these circumstances the court is compelled to look at the whole record, without need to accord great weight to the board's determination.[34] In the first *Sanders'* order it was stated:[35]

On the basis of the record before us, there is substantial doubt that the Board adhered to its own liberal mandate * *. * * * We have previously held that a Secretary and his Boards have an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief. * * * Further, the court has found that there must be satisfactory indication that a correction board's decision is based "upon a balanced consideration of all the evidence available and presented." *Smith v. United States*, 168 Ct.Cl. 545, 553 (1964).

In the case at hand, plaintiff's request for a hearing was turned down in executive session and relief denied upon the determination that there was insufficient evidence to indicate probable material error or injustice. The burden that would be placed upon plaintiff in this court would be almost impossible if the correction board were permitted, in these circumstances, to cast aside the issues without discussion or reason and merely state that insufficient evidence has been presented to indicate probable injustice or material error. As

---

28. *Armstrong v. United States*, 205 Ct.Cl. 754, 762 (1974); *Cooper v. United States*, 203 Ct.Cl. 300, 304 (1973).

29. *Caddington v. United States*, 147 Ct.Cl. 629, 634, 178 F.Supp. 604, 607 (1959).

30. Appendix A.

31. *Caddington v. United States, supra* note 29, 147 Ct.Cl. at 634, 178 F.Supp. at 607.

32. *Craft v. United States*, 210 Ct.Cl. 170, 185, 544 F.2d 468, 475 (1976).

33. *Beckham v. United States*, 183 Ct.Cl. 628, 636, 392 F.2d 619, 622–23 (1968).

34. *Loral Elecs. Corp. v. United States*, 181 Ct.Cl. 822, 832, 387 F.2d 975, 985 (1967).

35. *Sanders v. United States*, 207 Ct.Cl. 962, 963–64 (1975).

indicated in *Sanders,* the separation of a serviceman is not up to the discretion of the employer, but must be accomplished in accordance with statutes and regulations.[36] The fact that plaintiff, on the basis of the administrative record, has shown that the correction board has recognized in a previous case that the TAR program was in fact tenured and codified as BuPers Manual article 1020200.1.d, and that the Secretary of the Navy himself knew and approved the tenured nature of the program, and that LCDR Snyder was entitled to a hearing in that case, establishes plaintiff's claim before this court. As the United States Court of Appeals for the District of Columbia stated in *Greater Boston Television Corp.:* [37]

> Its supervisory function calls on the court to intervene not merely in case of procedural inadequacies, or bypassing of the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a "hard look" at the salient problems, [footnote omitted] and has not genuinely engaged in reasoned decision-making. * * *

Partly due to the correction board's decision to dismiss plaintiff's appeal in executive session, there is no substantial evidence to support the findings of the board. Upon our own evaluation of the record before us, it is concluded that the TAR program elected by plaintiff was a career "opportunity" offering tenure to its officers and that plaintiff has a right to recover. The correction board and the Secretary cannot disclaim their earlier pronouncements on the TAR program in the name of administrative discretion. The Supreme Court in *Burlington Truck Lines, Inc.,* spoke to this issue of administrative discretion: [38]

> There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act [footnote omitted] will not permit us to accept such adjudicatory practice. * * * Expert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion." [Citation omitted.] * * * [Emphasis in original.]

### VI.

On the basis of our foregoing analysis, we conclude that the correction board's final determination to deny plaintiff's application without a hearing or written explanation lacked a rational basis, was not supported by substantial evidence, and was contrary to law. The Navy's authority to terminate plaintiff was improperly exercised; plaintiff is entitled to back pay calculated in accordance with law; and we order his reinstatement to active duty in the rank of lieutenant commander from the date of his discharge.

On the one remaining issue, plaintiff alleges that portions of certain fitness reports were unjust and not properly reviewed by the correction board. The correction board denied relief on this as well as the other issues presented to it by plaintiff. After consideration of the parties' submissions and other papers, and *after hearing* oral arguments, we conclude that there are still factual questions on this issue that need to be resolved. If plaintiff wishes to pursue this question he is given 60 days from the date of this opinion within which to notify the Secretary of the Navy of his desire for reconsideration by the correction board, in which event the Secretary of the

---

**36.** *Sanders v. United States, supra* note 20, 219 Ct. Cl. at ——, 594 F.2d at 816.

**37.** *Greater Boston Television Corp. v. F.C.C.,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**38.** *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

Navy is directed to review plaintiff's application for correction of the specified fitness reports, pursuant to the procedures properly applicable in such cases. With this exception, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. Judgment is entered for plaintiff with the amount thereof to be determined pursuant to Rule 131(c).

APPENDIX A

DEPARTMENT OF THE NAVY

BOARD FOR CORRECTION OF
NAVAL RECORDS

WASHINGTON, D.C. 20370

OMF:sfc

(Seal)                22 January 1975

LCDR Richard S. Buchanan, USN 264–46–1645
Naval Reserve Center
350 Commercial St.
Portland, ME 04111

Dear Lieutenant Commander Buchanan:

Reference is made to your application for correction of your Naval record under the provisions of Title 10 U.S.C. [§] 1552.

Under long established rules followed by the courts and administrative boards, a presumption of regularity attaches to official records. Consonant therewith, the burden of proof is on a Petitioner to show by documentary evidence that an error has occurred or an injustice has been suffered.

Your allegations of error and injustice have been reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, naval records, and pertinent statutes, regulations and policies.

After careful and conscientious consideration of the entire record, the Board determined that insufficient evidence has been presented to indicate probable material error or injustice. Accordingly, your application has been denied.

It is regretted that the circumstances of your case are such that favorable action cannot be taken. You are privileged to submit new and material evidence for consideration. As explained above, however, the burden is on you to show that an error or injustice has occurred.

Sincerely yours,

SIGNED

LEO J. BROGAN
Acting Executive Secretary